IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BERTRAND THOMPSON,

    Petitioner,               No. CIV S-03-01375 ALA HC

    vs.

SILVIA GARCIA, et al.,

    Respondents.           <u>ORDER</u>

_____/

      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges a conviction entered in the San Joaquin County Court on October 22, 1999 for three counts of murder and two counts of second degree robbery. Petitioner is serving three indeterminate terms of life without the possibility of parole. For the reasons explained below Petitioner's petition is denied.

**I**

      On direct appeal, the California Court of Appeal summarized the facts underlying petitioner's conviction and sentence as follows:

**Castaneda–Del Real Robbery and Murders**

> On July 12, 1995, 16 year-old Julio Castaneda and his friend, Dario Del Real, were at a party at an apartment in Stockton. Castaneda had his mother's .380-caliber Taurus pistol with him; at

1

one point, he and Del Real shot the gun into the air from the balcony of the apartment. Thereafter, Castaneda and Del Real left the party with the gun, saying they were going around the corner to buy some drug paraphernalia.

Approximately five minute later, Miguel Ruiz, who was standing on the balcony outside the apartment, heard six to eight gunshots. He saw three or four black men between the ages of 18 and 22 years old running towards an older model car he described as a "ratty" brown or gold Mustang or Cougar. After the men sped away in the car, a Hispanic couple came around the corner and told Ruiz that two individuals had been shot. Ruiz and a friend ran around the corner and found Del Real and Castaneda on the asphalt on the east side of North San Joaquin Street.

Del Real died as the result of a gunshot wound to the left side of the head. An extremely damaged .22 caliber bullet was retrieved from his skull.

Castaneda died as the result of a relatively close-range gunshot wound to his chest. A "nominal" .38-caliber expended bullet casing was recovered from his body. A "nominal .38" includes a .38 special, a .357 Magnum, a 9-millimeter, and a .380 automatic.

At the scene, police officers found nine expended Winchester .380 shell casings, all fired from Castaneda's .380-caliber Taurus pistol, but did not find the gun. Six months later, in February 1996, the Taurus pistol was recovered during a routine traffic stop of a car driven by Ebien Alston. Alston told Detective David Anderson that Alston had traded an Uzi and $250 in cash to defendant Webb[1] for the Taurus Pistol. The Uzi was later found under a mattress in Webb's residence. When Detective Anderson interviewed him on February 28, 1996, Webb denied any knowledge of the Uzi or of the murders of Castaneda and Del Real. Anderson interviewed Webb again on February 12, 1998; this time, Webb admitted that he owned the Uzi. He also admitted "kick[ing] [Alston's] butt" for "snitching him off" regarding the trade for the Uzi.

At the scene of the homicides of Castaneda and Del Real, officers also found a pager that belonged to Christopher Culberson. Culberson and defendants were friends who lived in the same Stockton neighborhood. Culberson told officers that he was with defendants when Castaneda and Del Real were murdered. In exchange for his testimony, Culberson was not charged with the murders, criminal charges pending against him in Nevada were dismissed, and a bank robbery charge was reduced to grand theft. Because Culberson was murdered prior to trial, a redacted version of his testimony at defendants' preliminary hearing was read into the trial record as follows:

On the evening of the homocides, Culberson and

---

[1] The California Court of Appeal decision resulted from an appeal brought by Petitioner and Mr. Webb, a co-defendant at Petitioner's trial.

defendants were looking for some marijuana in downtown Stockton.  They were in [Petitioner's] brown Mustang, which had a missing bumper and grill.  The men planned to wait until someone approached them to sell them drugs while they sat in [Petitioner's] car, and then they would "snatch" the marijuana when the seller reached inside.  Although they were all armed, there were no plans to shoot or rob anyone; they simply carried guns with them everywhere they went.  If they could not snatch the marijuana, they were going to buy some with the eight dollars they had between them.

When no one approached them, they drove down a different street, parked, and got out of the car.  While they were walking down the street, someone behind them started shooting.  The men ducked and pulled out their guns; [Petitioner] had a .22 revolver, defendant Webb had a .38 revolver and Culberson had a .380 Glock.  When they did not see anyone shooting at them, they put away their weapons.

The men then headed eastbound toward the intersection of North San Joaquin Street and Flora Street, where they approached two young Hispanic boys. [Petitioner] asked the boys if they knew where the "weed" was, but the boys said they did not have any. Webb asked them if they were the ones shooting. Castaneda replied they had been shooting in the air. Webb asked Castaneda what kind of gun he had and if he wanted to sell it.  When Castaneda said he did not want to sell his pistol, Webb pulled out his .38 revolver, pointed it at Castaneda, and said, "Hand it here." Castaneda tried to comply, but Webb tackled him and shot him with the revolver before Castaneda had the Taurus Pistol out of his pocket.

Del Real was screaming and Culberson was looking at Castaneda on the ground when Culberson heard a second shot fired from the side.  Culberson turned and saw [Petitioner] putting his gun away as Del Real collapsed to the ground.  Webb picked up Castaneda's Taurus pistol, and Webb, [Petitioner], and Culberson ran from the scene.

On the way home in [Petitioner's] Mustang, Culberson asked Webb why he had shot Castaneda.  Webb replied that Castaneda had been "pulling for [his] gun."  When Culberson disagreed, Webb inspected the Taurus pistol and found it contained only an empty clip.

Culberson saw [Petitioner] the next day, and asked why he had shot Del Real.  [Petitioner] replied that he did them a favor because, if he had not shot him, the boy would have been a witness. [Petitioner] joked about the killing and said he "puffed" the boy.

**Flores Robbery and Murder**

On the night of October 20, 1995, Vincent Flores, who had arranged to make a sale of a large amount of methamphetamine, went to a meeting with the buyers outside a grocery store in

3

Stockton. His wife, Theresa, followed in another car and was to hold onto the bag of methamphetamine until Flores had received the purchase money. At that point, Flores would call her on his cellular telephone, and she would drop off the drugs.

After Flores parked his Blazer, Theresa watched two men get into the vehicle, which then drove out of the parking lot. She waited fifteen minutes for Flores to call. When he did not, she went looking for him. By the time Theresa found the Blazer, emergency vehicles were there. Thus, she hid the methamphetamine in some bushes.

Flores had been shot, and his lifeless body was in the front passenger seat. All the bullets that killed him were fired by the same weapon, which could have been either a .38 Special revolver or a .357 Magnum revolver. The pathologist who conducted the autopsy testified the locations of Flores's gunshot wounds were consistent with the bullets coming from a gun held to the left of the victim; however, the pathologist could not definitively reconstruct what happened at the time of the shooting. A California Department of Justice criminalist opined the most likely scenario was that the fatal wound came from the back seat of the vehicle.

Officers recovered the bag of methamphetamine that Theresa had secreted in the bushes; it held 446.4 grams of methamphetamine, with a wholesale value of $7,000 to $8,000. Flores's cellular telephone was found in the rear seat of his Blazer, and two loaded 9-millimeter magazine clips were found in his left front pocket. Flores's 9-millimeter handgun was missing.

Flores's black book contained telephone and pager numbers for "Tim" or "Timmy," and telephone records showed that Flores had been in contact with Timothy Bludworth.[2] Bludworth, who was [Petitioner's] brother-in-law, worked with Flores and had engaged in methamphetamine sales with him.

On February 25, 1998, Detectives Anderson and Gary Catherwood interviewed [Petitioner] at the Washoe County Jail in Nevada. [Petitioner] had fled to Nevada after Bludworth was arrested. After initially denying any involvement in the Flores murder, [Petitioner] admitted that he went with Bludworth to rob Flores in a fake methamphetamine buy. Bludworth was planning to get a quarter or half a kilogram of methamphetamine, and had [Petitioner] borrow a gun for Bludworth to use that night. [Petitioner's] cut from the robbery was going to be an ounce of methamphetamine.

According to [Petitioner], when he and Bludworth arrived at the grocery store, [Petitioner] got into the back of Flores's Blazer and Bludworth got into the front passenger seat. After talking to Flores as if it were a regular buy, Bludworth pulled out his gun and disarmed Flores. Bludworth gave Flores's gun to [Petitioner], who kept the gun aimed on Flores. Bludworth then got out of the Blazer, walked around the vehicle, and had Flores

---

[2] Timothy Bludworth was separately charged.

4

scoot over to the passenger seat.  They drove about while Bludworth and Flores argued about the location of the drugs. [Petitioner], who was tired of the argument and thought the transaction "wasn't going right," asked to be dropped off.  He was attempting to get out when Bludworth started shooting Flores. Bludworth had given Flores's cellular telephone to [Petitioner] who planned to take it.  But [Petitioner] got so scarred he dropped it as he ran away. [Petitioner] thought Bludworth was going to rob Flores.  He did not know that Bludworth was going to kill anyone.

Christopher Culberson learned of the Flores murder sometime in late October 1995.  His testimony about that event was as follows:

While Culberson was at defendant Webb's house, Webb made a trigger motion with his finger and told Culberson that "[Petitioner] did another one."  Webb stated [Petitioner] was supposed to meet a white man who was bringing a "pound of crank."  According to Webb, he drove [Petitioner] and Bludworth to meet the dealer at a grocery store and watched them get into a Blazer with a white man.  Webb heard gunshots, and [Petitioner] and Bludworth walked back to the car.  Webb said that he "knew the dude was dead" when he heard the gunshots.

[Petitioner] was not present when Webb told Culberson about the murder. [Petitioner] arrived about 20 minutes later, and Webb was standing five to six feet away when [Petitioner] told his version of the Flores murder. [Petitioner] said he was with his brother-in-law and Webb, who had driven them to meet the dealer. At the meeting, [Petitioner] climbed into the back seat of the dealer's Blazer.  At first, "the white guy" asked where the money was and if they were "playing games." [Petitioner] asked the man where his gun was, and Flores motioned in reply.  Bludworth reached for the gun, and [Petitioner] snatched the gun from his hand, asking Flores, "Where is the stuff?"  Flores explained that his girlfriend had the goods at a nearby gas station and he wanted to see the money before he went to make the exchange. [Petitioner] stated to Flores: "You mean you telling me you didn't bring the stuff with you?"  When Flores replied that he had not, [Petitioner] said: "Well, that's where you fucked up at" and shot him.

### Petitioner's Testimony

[Petitioner], who admitted that he had committed a first-degree residential burglary in 1996, denied killing anyone, stating that Webb and Culberson killed the two boys and Bludworth killed Flores. [Petitioner] testified as follows:

On the night of the Castaneda and Del Real murderers (sic), [Petitioner] was with Webb and Culberson, who said they should go downtown to "snatch" some weed from the "Mexicans."  They planned to approach someone selling marijuana, get it in their own hands, and run off. [Petitioner] had a 9-millimeter gun which could use .380 bullets, Webb had a .380 automatic handgun, and Culberson was carrying a .22-caliber revolver; but they did not

5

plan to use the guns. [Petitioner] drove his 1972 Mustang.

According to [Petitioner], he was not with Webb or Culberson at the time of the shootings. He was across the street near the intersection of Hunter and Flora when he saw Webb and Culberson arguing with two black men, who ran north on Hunter. [Petitioner] heard a series of gunshots, and then heard two more shots as he was heading towards the cars. He saw Webb and Culberson standing around the corner; two bodies were lying in the street. Webb and Culberson ran towards him, and [Petitioner] picked up the gun that Culberson dropped. After some confusion, they found their car and left the area with [Petitioner] driving. Webb and Culberson told [Petitioner] not to tell anybody. A few days later, Culberson said he had "puffed that motherfucker."

Regarding the Flores murder, [Petitioner] admitted procuring a gun for his brother-in-law, Bludworth, to use in a drug run and that [Petitioner] had agreed to go with Bludworth and bring a friend in exchange for one ounce each of methamphetamine. Bludworth picked [Petitioner] up that evening, and Webb joined them. Although [Petitioner] admitted he had known the gun he borrowed for Bludworth was going to be used in a robbery, he claimed he did not know for sure that Bludworth was planning a robbery until [Petitioner] got in the car and Bludworth "told me exactly." Bludworth said that one of his partners was going to bring him a quarter kilo or a half kilo and that he was going to "burn" him, which meant a "rip-off." [Petitioner] knew Bludworth was going to rob the drug dealer, but neither he nor Webb backed out after Bludworth told them his plan. On the way to the meeting, [Petitioner] stopped at his mother's house and obtained a bag full of pieces of paper he intended to pass off as money.

Bludworth drove them to a park near a grocery store, and Webb stayed with the car while [Petitioner] and Bludworth went to meet Flores. Webb gave [Petitioner] his 9-millimeter Ruger with a laser sight to take with him.

When the two men arrived at Flores's vehicle, [Petitioner] climbed into the back seat. Flores pulled out two baggies, handed them to Bludworth, and told him to check out the methamphetamine. When Flores asked if he had the money, Bludworth said yes and pulled out a gun. At this point, Flores admitted that he did not have all of the methamphetamine with him. Bludworth asked Flores where his gun was, then grabbed the gun and gave it to [Petitioner] with instructions that he hold it on Flores. Nevertheless, according to [Petitioner] he did not point the gun at Flores. Bludworth then got out of the Blazer, walked around to the driver's side, and directed Flores's to scoot over. Bludworth grabbed Flores's cellular telephone and gave it to [Petitioner].

As Bludworth started to drive out of the parking lot, [Petitioner] thought things "[were not] going right" and told Bludworth to take him back to Webb. When they got to the stop sign, Bludworth opened the driver's door and [Petitioner] started to

move over; but, before he got out of the car, he heard a gunshot and dropped the cellular telephone.  After pushing Bludworth forward so he could squeeze out of the vehicle, [Petitioner] ran back to the car where Webb was waiting.  When Bludworth arrived at the car, [Petitioner] still had Webb's gun and Flores's gun, which he gave to Bludworth.

### Defendant Webb's Testimony

Webb testified as follows:
Culberson was a violent and dishonest person.  They ended their friendship in 1996 after Culberson "ripped-off" $200 or $250 in cocaine.
On the night of the Castaneda and Del Real homicides in 1995, Webb and Culberson each had four or five dollars and set out with [Petitioner] to by some marijuana.  Webb did not intend to "snatch" any drugs, although there may have been some discussion regarding a "snatch" from the "Mexicans."  They were driving in [Petitioner's] "ratty old Mustang," but stopped and got out near Sutter Street because the car did not have enough gas.
When they approached two black men about buying marijuana, Webb heard shots being fired from down the street.  He ducked, pulled out his .38-caliber revolver and, after the shooting stopped, ran around the corner on San Joaquin street.  Webb saw Culberson and [Petitioner] talking to Castaneda and Del Real.  They asked the boys if they had been shooting at them and if they had any "weed."  The boys replied that they had not been shooting at anyone and did not have any marijuana for sale. [Petitioner] and Culberson asked if the boys where the group could buy some marijuana.
At this point, Webb saw that Castaneda had a look in his eyes and it seemed like he was going for something in his waistband, which Webb thought might be a gun.  Webb lurched at Castaneda and pulled out his own gun, which went off.  Webb heard a second shot, then got up and ran towards North San Joaquin Street.  According to Webb, Culberson took Castaneda's Taurus pistol.  Webb did not see Thompson shoot Del Real.
When they were all in the car, Culberson asked Webb why he shot Castaneda and showed him the empty ammunition clip in the Taurus pistol.  Culberson asked [Petitioner] why he had shot the other boy, and [Petitioner] replied he did them a favor since the boy would have been a witness.
Sometime in the next two months, Culberson traded Webb the Taurus pistol for some marijuana and cash, and Webb traded the gun and some cash to Ebien Alston for the Uzi.  Webb admitted that he and Culberson beat up Alston for talking to the police about trading his Uzi for the Taurus.  He also admitted that he had lied to Detective Anderson during his interviews and had not revealed to Anderson that he had shot Castaneda in self-defense.
Regarding the Flores murder and robbery, Webb stated that

7

> [Petitioner] called him the day of the murder to see if he wanted to contribute $200 or $300 towards a drug buy that [Petitioner's] brother-in-law was putting together. [Petitioner] said Webb would receive an ounce of methamphetamine in return. Webb declined but went along for the ride. He denied he was armed that night.
>
> While he was waiting alone at the park, Webb heard gunshots and then saw [Petitioner] and Bludworth come running towards him. Bludworth drove them home. When Webb asked what happened Bludworth stated: "it wasn't supposed to happen like that." Bludworth said that he had to shoot the dealer because the "guy" did not have the "stuff." At first, Webb denied talking to Culberson about the Flores murder; he then admitted that three or four days after the murder he told Culberson that [Petitioner] "did another one. He shot a guy because he didn't have the stuff."

Answer, Ex. D at 3-14.

Petitioner's conviction and sentence were upheld on appeal. *Id.* at 28. Petitioner sought review of the California Court of Appeal decision in the California Supreme Court. Answer, Ex. E. Petitioner's request for review was denied without comment. Answer, Ex. F.

## II

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

1   Under the "unreasonable application" clause of section 2254(d)(1), a federal
2  court may grant an application for a writ of habeas corpus if the state court identifies the correct
3  governing legal principle from the Supreme Court's decisions, but unreasonably applies that
4  principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.  A federal habeas court
5  "may not issue the writ simply because that court concludes in its independent judgment that the
6  relevant state-court decision applied clearly established federal law erroneously or incorrectly.
7  Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*,
8  538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of
9  the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

10   A federal court looks to the last reasoned state court decision as the basis for the
11  state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court
12  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal
13  court must independently review the record to determine whether habeas corpus relief is
14  available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  As the
15  last reasoned state court opinion in this matter, this court will review the decision of the
16  California Court of Appeal. *See* Answer, Ex. D.

**III**

18   Petitioner claims that "[t]he evidentiary record required the trial court to instruct
19  on attempted theft and theft as lesser included offenses of attempted robbery."  Amended
20  Petition at 4.  The California Court of Appeal rejected petitioner's argument.

21   In the Castaneda and Del Real robbery and murders the California Court of
22  Appeal held that an instruction on a lesser included offense must be given only when there is a
23  question as to whether all elements of a charged offense were present and there is evidence
24  justifying conviction of a lesser offense.  Answer, Ex D. at 19.  The California Court of Appeal
25  found no evidence raising a question as to whether all the elements of robbery where present and
26  therefore rejected Petitioner's claim. *Id.*

In the Flores robbery and murder the California Court of Appeal held that even if the evidence warranted a jury instruction on attempted theft or theft, the trial court committed only harmless error because there was no showing of a reasonable probability that the lack of the requested instruction affected the outcome. *Id*. at 22.  Specifically the court noted that the jury found that Petitioner used a firearm in the commission of the offense at issue. *Id.*  Use of a firearm during a theft is a robbery because the theft involves the use of force. *Id.*  As such, it was not probable that, even if instructed, the jury would have found Petitioner guilty of attempted theft or theft instead of robbery. *Id.*  Petitioner again challenges the refusal of the trial court to instruct the jury on attempted theft and theft as lesser included offenses, arguing, "[t]he evidence warranting instruction on attempted theft and theft was overwhelming." Petition at 4.

A challenge to jury instructions does not generally state a federal constitutional claim. *See Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." *Hines v. Enomoto*, 658 F.2d 667, 672 (9th Cir. 1981) (citing *Quigg v. Crist*, 616 F.2d 1107 (9th Cir. 1980)); *See also Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process.")  The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), whether an error had "a substantial and injurious effect" on the outcome. *See Thomas v. Hubbard*, 273 F.3d 1164, 1179 (9th Cir. 2001), overruled on other grounds by *Payton v. Woodford*, 299 F.3d 815, 828 n.11 (9th Cir. 2002).

Because the omission of an instruction is less likely to be prejudicial than a

misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular instruction bears an especially heavy burden. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Here, Petitioner has not overcome that burden for either robbery.

As to the Castaneda and Del Real robbery and murders Petitioner argues that, "[t]here was no plan to 'rob people'– the plan was to snatch marijuana. The important fact is that 'snatching' is 'not robbery.'" Petition at 6. However, as the California Court of Appeal stated...

> [a]lthough there is evidence that defendants were planning to steal marijuana from someone, they do not identify any substantial evidence that they were attempting to steal marijuana from the victims at the time the boys were shot, such that defendants could be found guilty of attempted theft as a lesser included offense of the charged robbery. Rather, the evidence discloses that the boys said they did not have any marijuana and that defendants asked where they could buy some, after which one of the following occurred: (1) Webb stole Castaneda's gun at gunpoint and shot him, whereupon [Petitioner] shot Del Real because he was a witness; (2) Webb, who only intended to buy marijuana, shot Castaneda when it looked like he was going for a gun, and [Petitioner] then shot Del Real because he was a witness; or (3) [Petitioner] was not present when Webb and Culberson shot the boys and took the Taurus pistol, and [Petitioner] proffered no testimony regarding what precipitated the shooting. None of these scenarios support a determination that defendants were engaged in an attempted theft of marijuana from the boys at the time the boys were shot.

Answer, Ex. D at 16-17.

As to the Flores robbery and murder Petitioner argues that, "[b]ecause the court cannot determine which theory the jury relied upon, and the jury instruction error in failing to instruct on theft affected the 'robbery-of-gun' theory, too, reversal is required for the reasons set forth above regarding the Castaneda convictions." Petition at 15. However, Petitioner testified that he armed himself and accompanied Bludworth to meet Flores, knowing that Bludworth intended to rob Flores. Answer, Ex. D at 21. *See also* Petition at 16 (Petitioner recounting his cross examination: "I didn't know it was going to be a robbery until we got in the car.") Petitioner points to his use of a bag full of fake money as evidence that Petitioner did not intend

to take the drugs by force. Petition at 17. However, as the California Court of Appeal noted, it was unreasonable to believe that a drug dealer would not verify the receipt of money prior to surrendering a pound of methamphetamine and Petitioner could not explain how they intended to get the drugs without payment or use of force. Answer, Ex. D at 22.

Based upon the evidence presented, Petitioner was not entitled to an instruction on the lesser included offenses of attempted theft or theft in either robbery. Therefore, the refusal by the trial court to instruct the jury on the lesser include offenses of attempted theft or theft was not a violation of federal law, was not an unreasonable application of law to facts and did not render Petitioner's trial fundamentally unfair.

**IV**

Petitioner alleges that his conviction was based solely upon the testimony of Christopher Culberson and that Mr. Culberson was an accomplice as a matter of law. Petition at 4. Petitioner alleges that this violated California Penal Code § 1111.

California Penal Code §1111 reads...

> [a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
>
> An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

Cal. Penal Code §1111.

The California Court of Appeal concluded that Mr. Culberson was not an accomplice and therefore Petitioner was properly convicted under the California state statute. Answer, Ex. D at 26. In this regard, the conclusion by the California Court of Appeal may not be set aside in this federal habeas corpus proceeding. *See Estelle*, 502 U.S. at 67-68 (a federal writ is not available for alleged error in the interpretation or application of state law); *Aponte v.*

*Gomez*, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its own penal statutes"); *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989) (a federal court must defer to the state court's construction of its own penal code unless its interpretation is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation"). There is no evidence before this court that the interpretation of the California statute by the California Court of Appeal is untenable and or amounts to a subterfuge. Therefore, this claim does not support habeas corpus relief.

### V

Petitioner asserts that, because his conviction was based entirely on what Petitioner contends was the testimony of an accomplice, Petitioner received ineffective assistance of counsel because his trial counsel failed to move for an acquittal under California Penal Code § 1118.1. Petition at 5. California Penal Code § 1118.1 reads...

> [i]n a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right.

Cal. Penal Code § 1118.1. Petitioner claims that, "[w]hen Culberson's testimony is removed from the prosecution's case, there is no evidence connecting Petitioner to the Castaneda/Del Real crimes....There can be no 'tactic' in failing to make a dismissal motion and remove two murder charges and a robbery charge from the jury's consideration." Petition at 24.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a Petitioner must first show that, considering all the circumstances, counsel's

13

performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id. See also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 697).

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689). There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689). However, that deference "is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).

Petitioner's claim of ineffective assistance of counsel could only be substantiated if it were true that Mr. Culberson was an accomplice. The California Court of Appeal found that Mr. Culberson was not an accomplice, and therefore Petitioner did not receive ineffective

assistance of counsel. Answer, Ex. D at 26. As discussed above, this court cannot disturb the ruling of the California Court of Appeal in regard to whether or not Mr. Culberson was an accomplice. If Mr. Culberson was not an accomplice, then there was no grounds for Petitioner's attorney to move for a judgment of acquittal. As such, Petitioner's claim fails because he cannot point to any act or omission by his trial counsel that was not the result of reasonable professional judgment.

## VI

Finally, Petitioner claims that, "[b]ased on the verdicts, the evidence was insufficient to support Petitioner's convictions in the Castaneda/Del Real shooting and the Flores shooting." Petitioner at 5.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir. 2007).

The court must review the entire record when the sufficiency of the evidence is

challenged in habeas proceedings. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991). "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

As to the convictions for the Castaneda and Del Real robbery and murders, Petitioner testified that he agreed to travel with the other defendants to steal marijuana from someone. RT at 1294-1295. Petitioner agreed that the stealing could be characterized as a robbery. RT at 1348. Finally, Petitioner testified he was armed. RT at 1295.

Webb's testified that Petitioner admitted shooting Del Real. RT at 1604. Additionally, the jury was presented with a redacted copy of Culberson's preliminary hearing transcript[3] at which Culberson testified that he saw Petitioner putting his gun away shortly after Del Real fell to the ground and that the next day Petitioner admitted to killing Del Real. Clerk's Augmented Transcript on Appeal at 21-25. Presented with such evidence, a rational juror could reach the conclusion reached in this matter and find Petitioner guilty of one count of robbery and two counts of murder.

---

[3] Because Culberson was murdered prior to trial, a redacted version of his testimony at defendants' preliminary hearing was read into the trial record.

1   As to the Flores robbery and murder, Petitioner testified that he accompanied
2 Culberson knowing that Culberson intended to rob Flores.  RT at 1540.  Petitioner also testified
3 that he loaned Culberson a handgun to use during the robbery.  RT at 1480.  Petitioner testified
4 that he was also armed.  RT at 1482.  Additionally, the jury was presented with a redacted copy
5 of Culberson's preliminary hearing transcript at which Culberson testified that it was Petitioner
6 that demanded the drugs from Flores at gun point, that Petitioner took Flores' weapon and that
7 Petitioner admitted to shooting Flores.  Clerk's Augmented Transcript on Appeal at 37.
8 Presented with such evidence, a rational juror could reach the conclusion reached in this matter
9 and find Petitioner guilty of one count of robbery and one count of murder.  Therefore, after a
10 review of the entire record, this court finds that the evidence was sufficient to support
11 Petitioner's conviction on all counts.

**VII. Conclusion**

In accordance with the above, IT IS HEREBY ORDERED that Petitioner's petition for habeas corpus relief under § 2254 is denied and is dismissed.

DATED: September 18, 2007

/s/ Arthur Alarcón
UNITED STATES CIRCUIT JUDGE
Sitting by Designation